**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES ex rel. HOLMES** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **CIVIL NO.: 1:13cv85-HSO-RHW** |
| | § | |
| **NORTHROP GRUMMAN** | § | **DEFENDANTS** |
| **CORPORATION AND HUNTINGTON** | § | |
| **INGALLS INCORPORATED** | § | |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' [151]
MOTION TO DISQUALIFY RELATOR AND DISMISS FIRST AMENDED
COMPLAINT AND DENYING AS MOOT DEFENDANTS' [102] MOTION TO
DISMISS AMENDED COMPLAINT**

BEFORE THE COURT is the Motion to Disqualify Relator and Dismiss First

Amended Complaint [151] filed by Defendants Northrop Grumman Corporation and

Huntington Ingalls Incorporated.  Relator Donald Holmes has filed a Response

[156], and Defendants have filed a Reply [157].  Also before the Court is the Motion

to Dismiss Amended Complaint [102] filed by Defendants, Relator's Response [117],

and Defendants' Reply [103].[1]  Having considered the parties' submissions, relevant

legal authorities, and the record, the Court is of the opinion that the Motion to

Disqualify Relator and Dismiss First Amended Complaint [151] should be granted,

Relator Donald Holmes should be disqualified from serving as a relator based on

the totality of the circumstances surrounding his conduct as a relator, and this civil

---

[1] This case was transferred from the United States District Court for the District of Columbia to this Court by Order [73] dated February 28, 2013.  The Motion to Dismiss Amended Complaint [102], Response [117], and Reply [103], were each filed before the case was transferred and were refiled on this Court's docket following the transfer.

case should be dismissed without prejudice to any rights of the United States government.  The Court further finds that the Motion to Dismiss Amended Complaint [102] should be denied as moot.

## I. BACKGROUND

Hurricane Katrina made landfall on the Mississippi Gulf Coast on August 29, 2005.  As a result of the damages caused by the hurricane, Northrop Grumman Corporation ("NGC") made claims on an insurance policy issued to a subsidiary of NGC by Munich Re, an insurance company represented by attorney Gerald Fisher ("Fisher").  First Am. Compl. 5 [43]; Aff. of Relator Gerald Fisher ("Fisher Aff.") ¶ 7 [11 (Attach. A), 23-24 of 86].  To obtain documents from NGC during the adjustment process, Fisher, on behalf Munich Re, entered into a confidentiality agreement with NGC dated October 24, 2006, governing the use of documents produced by NGC.  Fisher Aff. ¶ 7 [11 (Attach. "A"), 26 of 86]; Confidentiality Agreement [11, 56 of 85].

By April 2010, NGC and Munich Re had commenced arbitration proceedings in London, England, to resolve coverage disputes which had arisen related to NGC's claim for insurance benefits ("UK Arbitration").  Fisher, along with attorney Donald Holmes ("Holmes"), represented Munich Re in the UK Arbitration.  Mem. in Supp. of Relators' Mot. to Allow Them to Provide Information to Assist the [DOJ] in Its Investigation 7 [11, 12 of 86] ("Relators' Mot. to Assist the DOJ").  Fisher and Holmes filed a complaint on behalf of Munich Re on April 6, 2010, in the United States District Court for the District of Columbia seeking to obtain documents from

the United States Navy ("the Navy") purportedly for use in the UK Arbitration. Compl. 1 [1], Case No. 1:10-cv-00551-JEB (D.D.C.) (the "*Touhy* Action"). On June 2, 2010, while both the UK Arbitration and the *Touhy* Action remained pending, Fisher and Holmes filed the Complaint [1] in this case under seal in the United States District Court for the District of Columbia against NGC, Northrop Grumman Shipbuilding Corporation, and Northrop Grumman Ship Systems, Inc. (collectively, "Northrop Grumman"), under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").[2] The United States has declined to intervene in this case. Notice of Election to Decline Intervention 1 [20].

On August 18, 2012, prior to the transfer of the case, Fisher apparently decided to withdraw from serving as a relator, and Holmes filed the operative First Amended Complaint [43] in this case. Holmes alleges that "[t]his case is a civil false claims action brought on behalf of the United States by [Holmes], who has properly gained access to documents and information showing that the U.S. Government has been defrauded in the amount of not less than $835 million by the unlawful actions of" Northrop Grumman. First Am. Compl. 5 [43]. Holmes asserts that prior to Hurricane Katrina's landfall, Northrop Grumman was behind "in its budget in the performance" of various shipbuilding contracts with the Navy. *Id.* at 6. Holmes notes that "[w]ithin months after Hurricane Katrina . . . , Congress appropriated $2.3 billion to the Navy in restricted emergency shipbuilding and

---

[2] "The FCA's *qui tam* provisions permit a private individual, as a relator, to sue on the United States' behalf to recover for false claims for payment submitted to the Government." *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013).

conversion funding [] (hereinafter 'the Katrina Money') . . . ."  *Id*. at 7.  According to Holmes, the Katrina Money "was to be used only for 'the consequences' of" Hurricane Katrina, but Northrop Grumman filed false claims with the Navy by seeking reimbursement for unrelated cost overruns which it experienced before and after Hurricane Katrina, thus allowing Northrop Grumman to avoid the consequences of its alleged inefficiency and mistakes.  *Id*. at 7-11.

On the basis of these allegations, Holmes advances claims for violations of the FCA.  Am. Compl. 15-24 [1].  Holmes maintains that Northrop Grumman violated the FCA by misusing restricted Congressional funding to cover cost overruns on contracts for which Northrop Grumman was financially responsible and by using "[a]rtifices and [d]evices" to deceive the Navy into paying for Northrop Grumman's non-Katrina related cost overruns.  *Id*. at 15-20.  Holmes further asserts that Northrop Grumman violated the FCA by providing untruthful information to the Navy and Congress to prevent them from making accurate procurement decisions, to conceal the status of contract performance related to seven shipbuilding contracts, and to prevent discovery of the fact that Northrop Grumman was not keeping separate accounting records which segregated Hurricane Katrina's monetary consequences from unrelated costs.  *Id*. at 20-23.

Northrop Grumman now moves to disqualify Holmes from serving as a relator and to dismiss the First Amended Complaint based on alleged ethical violations committed by Holmes.  Mem. Br. in Supp. of Mot. to Disqualify Relator

and Dismiss First Am. Compl. 1 [153].  According to Northrop Grumman, Holmes
has breached his ethical duties of obedience to court orders, candor and honesty to
the courts and to Northrop Grumman, respect for Northrop Grumman's legal rights,
and loyalty to his former client, Munich Re.  *Id*. at 12-13.  Northrop Grumman
maintains that Holmes' conduct was not authorized or required by either the FCA
or misprision of felony statute, 18 U.S.C. § 4.  *Id*. at 19-24.

Holmes offers excerpts from various prior filings which he asserts address
Northrop Grumman's Motion [151].  Resp. in Opp'n to Defs.' Mot. to Disqualify and
Dismiss 2-9 [156].  Holmes claims that "[f]ederal courts have repeatedly held that
confidentiality agreements are not a bar to the disclosure of fraud to the
government" and posits that such holdings are "directly applicable" here.  *Id*. at 3-5.
Holmes asserts that Munich Re had no objection to his decision to report Northrop
Grumman's alleged fraud to the United States Department of Justice ("DOJ").  *Id*.
at 8-9.  Holmes also acknowledges that he violated the terms of a Stipulated
Protective Order issued by the Court in the *Touhy* Action and notes that "with 20/20
hindsight, he should have handled the situation differently[,]" but Holmes appears
to argue the Order is not entitled to be accorded the weight of a court order.  *Id*. at
10-11.  Holmes also posits that the ethical nature of his conduct should not be
considered because the FCA preempts the ethical rules governing his conduct.  *Id*.

## II. DISCUSSION

A.    Legal Standard

In allowing an attorney to serve as a relator and finding the attorney was nevertheless still required to abide by his ethical obligations as an attorney, one court has reasoned that "[w]hile the [FCA] permits any person . . . to bring a *qui tam* suit, it does not authorize that person to violate state laws in the process." *United States ex rel. Doe v. X Corp. ("X Corp. II")*, 862 F. Supp. 1502, 1507 (E.D. Va. 1994).  Although attorneys may act as relators pro se, non-attorneys are prohibited from proceeding as relators pro se.  *See, e.g., Timson v. Sampson*, 518 F.3d 870, 873-74 (11th Cir. 2008) (finding that a non-attorney was "not [authorized to] maintain a *qui tam* suit under the FCA as a pro se relator").  A primary policy reason for this prohibition is that "[l]awyers are bound to ethical constraints to which non-lawyers may have no knowledge and no obligation[, and v]iolation of these fundamental canons may result in serious consequences to the errant attorney."  *United States ex rel. Schwartz v. TRW Inc.*, 118 F. Supp. 2d 991, 995 (C.D. Cal. 2000).  Furthermore, "[a]n attorney 'has an obligation which he owes to the court[ . . . ], and he owes a public duty to aid in the administration of justice, to uphold the dignity of the court and respect its authority.'"  *Id.* (quoting *United States v. Onan*, 190 F.2d 1, 6-7 (8th Cir. 1951)).  These ethical obligations and the consequences of breaching them remain applicable to attorneys proceeding as relators pro se.  *See X-Corp. II*, 862 F. Supp. at 1507 ("[S]tate statutes and rules

that regulate an attorney's disclosure of client confidences" apply in the context of a *qui tam* action, and attorneys serving as relators therefore have "significant incentives . . . to abide by their" state law obligations in light of this fact and "given the existence of state disciplinary powers over attorneys . . . .").  Because Holmes is permitted to act as a relator pro se in this matter due to his status as an attorney, the Court will evaluate whether he should be disqualified from serving as a relator by reference to the rules of professional conduct governing Holmes as an attorney.

An attorney's breach of his ethical obligations may be raised in a motion to disqualify counsel, which is a "substantive motion[] . . . determined by applying standards developed under federal law." *In re Am. Airlines*, 972 F. 2d 605, 610 (5th Cir. 1992) (citations omitted) (emphasis removed).  Generally, when considering a motion to disqualify counsel in a civil case, the Fifth Circuit Court of Appeals "consider[s] the motion governed by the ethical rules announced by the national profession in the light of the public interest and the litigants' rights." *In re Dresser Industries, Inc.*, 972 F.2d 540, 543 (5th Cir. 1992).  While "the relevant local and national ethical canons provide a useful guide for adjudicating motions to disqualify, they are not controlling." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995) (citation omitted).  "A court must take into account not only the various ethical precepts adopted by the profession but also the social interests at stake[,]" including whether the lawyer's conduct "has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and

(3) the likelihood of public suspicion from the impropriety outweighs any social

interests which will be served by the lawyer's continued participation in the case."

*Id.* (quoting *Dresser*, 972 F.2d at 544) (internal marks omitted).  Disqualification of

counsel "is a sanction that must not be imposed cavalierly[,]" and the record must

reveal "at least a reasonable possibility that some identifiable impropriety actually

occurred[]" before disqualification will be justified.  *Id.* at 1316.

B.    Analysis

1.    The Court Will Consider the Ethical Nature of Holmes' Conduct

Insofar as Holmes takes the position that the ethical nature of his conduct is

not relevant because the FCA preempts the ethical rules governing his conduct, this

argument is not persuasive.  Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss

10-11 [156].  Courts addressing the issue of whether the FCA preempts state ethics

rules have declined to find preemption.  In *United States v. Quest Diagnostics Inc.*,

the Second Circuit Court of Appeals refused to conclude that the FCA preempts the

State of New York's ethical rules governing attorneys' conduct.  734 F.3d 154, 163

(2d Cir. 2013) ("Nothing in the [FCA] evinces a clear legislative intent to preempt

state statutes and rules that regulate an attorney's disclosure of client

confidences.") (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

Holmes' position is further refuted by the fact that non-lawyers are prohibited from

proceeding pro se as *qui tam* relators while lawyers may proceed pro se as *qui tam*

relators due to the ethical obligations to which lawyers remain bound and may be

8

subjected to discipline for violating.  *See Schwartz*, 118 F. Supp. 2d at 995 (quoting *Onan*, 190 F.2d at 6-7).  Accordingly, the Court rejects Holmes' invitation to ignore the ethical implications of his conduct.

      2.   <u>Holmes Has Breached Various Standards of Ethics</u>

In assessing the entirety of Holmes' conduct related to this case, the Court must identify the applicable "local and national ethical" standards.  *See U.S. Fire*, 50 F.3d at 1314 (citation omitted).  Much of Holmes' conduct occurred while the case was pending in the United States District Court for the District of Columbia.  This Court therefore will look to "the Rules of Professional Conduct[, ]as adopted by the District of Columbia Court of Appeals" ("DCRPC").  D.D.C. Loc. R. 83.15(a).  The Local Uniform Civil Rules for the Northern and Southern Districts of Mississippi provide that the Mississippi Rules of Professional Conduct ("MRPC") govern litigants practicing in this Court, and thus the Court will also consider the MRPC given the transfer of the case to this Court.  *See* L. U. Civ. R. 83.1(c).  In addition, the Fifth Circuit recognizes the American Bar Association's Model Rules of Professional Conduct ("ABA Model Rules") as "the national standards utilized by this circuit in ruling on disqualification motions."  *Am. Airlines*, 972 F.2d at 610.  Because of the unique procedural history of this case, the Court will consider the totality of Holmes' conduct related to this case in light of the ethical standards set forth in both the DCRPC and MRPC, as well as those of the ABA Model Rules.

a.   <u>Holmes Violated His Duty of Candor</u>

The record reveals that Holmes has violated his ethical duty to act with candor.  "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ."  ABA Model Rule 3.3(a)(1); *see also* DCRPC 3.3(a)(1) (same); MRPC 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal . . . .").  Additionally, "[i]n the course of representing a client a lawyer shall not knowingly[] . . . make a false statement of material fact or law to a third person . . . ."  ABA Model Rule 4.1(a); *see also* DCRPC 4.1(a) (same); MRPC 4.1(a) (same).  "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ."  ABA Model Rule 8.4(c); DCRPC 8.4(c) (same); MRPC 8.4(c) (same).

Holmes and Fisher filed the *Touhy* Action on April 6, 2010, pursuant, in part, to 28 U.S.C. § 1782,[3] and represented to the Court that Munich Re sought documents from the Navy "in aid of" the UK Arbitration.[4]  Compl. 1-4 [1], Case No. 1:10-cv-00551-JEB (D.D.C.).  Northrop Grumman and Munich Re, through Holmes and Fisher, subsequently submitted a Stipulated Protective Order, the terms of which were agreed upon by Munich Re, Northrop Grumman, and the Navy, which

---

[3] Section 1782 allows parties to apply for and obtain an order that the Navy be required "to produce a document . . . for use in a proceeding in a foreign . . . tribunal."  28 U.S.C. § 1782(a).
[4] Munich Re, through Holmes and Fisher, filed an Amended Complaint [21] on May 3, 2010, but the allegations in the Amended Complaint relevant to this Court's analysis do not differ from those of the Complaint.  *See* Am. Compl. 7, 11 [21], Case No. 1:10-cv-551-JEB (D.D.C.).  In fact, Holmes and Fisher, on behalf of Munich Re, further alleged that Munich Re's "exercise of rights provided by 28 U.S.C. § 1782 are in aid of private foreign arbitration only . . . ." Am. Compl. 11 [21].

specifically recited that Munich Re "has a need for the documents being produced by the U.S. Navy for the purposes of the UK Arbitration[,] . . . [and Munich Re] is agreeable to entering into this protective order and protecting the documents [produced by the Navy] appropriately . . . ."  Stipulated Protective Order 3 [19-1], Case No. 1:10-cv-551-JEB (D.D.C.).  The parties' Stipulated Protective Order was entered on June 24, 2010, as an Order of the United States District Court for the District of Columbia.  Order 1, Ex. A [20], Case No. 1:10-cv-00551-JEB (D.D.C.).

Holmes points out that this *qui tam* case was not filed until June 2, 2010, nearly two months after he and Fisher filed the *Touhy* Action, and Holmes appears to suggest that there cannot be a connection between documents sought from the Navy in the previously filed *Touhy* Action and this *qui tam* case.  Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 7 [156].  Holmes, however, acknowledges in the First Amended Complaint [43] he filed in this case that he had "gained access to documents and information showing that the U.S. Government has been defrauded" and explicitly based his claim on "documentation submitted by Northrop Grumman to the Navy . . . ."  Am. Compl. 5, 6, 10, 11 [43].[5]  These allegations reveal Holmes' clear intent to support his *qui tam* claims in this case with the documents he

---

[5] Holmes and Fisher even predicted in the original Complaint [1] that "[u]pon review of documents submitted by Northrop Grumman to the [Navy], . . . those records will show that Northrop Grumman also improperly used Katrina Money for pre-Katrina overruns . . . ."  Compl. 8 [1].  Though slightly rephrased, this allegation also appears in the First Amended Complaint [43] filed by Holmes.  *See* First Am. Compl. 11 [43] ("[Holmes] alleges that the records submitted by Northrop Grumman to the Naval Sea Systems Command in support of its claims for payment show that Northrop Grumman also improperly used Katrina Money for pre-Katrina overruns to its subcontracts and material costs.").

obtained from the Navy through the *Touhy* Action purportedly for use in the UK Arbitration.  This calls into question the veracity of Holmes' statements made not only to the court in the *Touhy* Action as to why he sought the documents but also to this Court insofar as Holmes alleges he has "properly gained access to" the documents upon which the First Amended Complaint is based.  *See*, *e.g.*, Am. Compl. 11 [21], Case No. 1:10-cv-551-JEB (D.D.C.) (alleging, through Holmes and Fisher, that Munich Re's "exercise of rights provided by 28 U.S.C. § 1782 are in aid of private foreign arbitration only"); Ex. "A" to Jt. Mot. to Enter Protective Order 3 [19-1], Case No. 1:10-cv-551-JEB (D.D.C.) (submitting proposed stipulated protective order in which Munich Re, through Holmes and Fisher, recites that it "is agreeable to entering into this protective order and protecting the documents [produced by the Navy] appropriately"); First Am. Compl. 5 [43].  There is no evidence in the record that Holmes ever attempted to correct these statements.  As a result, the Court finds that Holmes violated his duty of candor by obtaining documents from the Navy through the *Touhy* Action without disclosing his intent to use the documents to support his claims in this *qui tam* case.

        b.    <u>Holmes and His Duty of Loyalty to Munich Re</u>

Unless the client gives informed consent, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."  ABA Model Rule 1.7(a).  "A concurrent conflict of interest exists if[] . . . there is a significant risk that the representation of one or more clients will be materially limited by the

lawyer's responsibilities to . . . a third person or by a personal interest of the

lawyer." *Id*. at 1.7(a)(2); *see also* DCRPC 1.7(b)(4) ("[A] lawyer shall not represent a

client with respect to a matter if[] . . . [t]he lawyer's professional judgment on behalf

of the client will be or reasonably may be adversely affected by the lawyer's

responsibilities to or interests in a third party or the lawyer's own financial,

business, property, or personal interests."); MRPC 1.7(b) ("A lawyer shall not

represent a client if the representation of that client may be materially limited by

the lawyer's responsibilities . . . to a third person[] or by the lawyer's own interests

unless . . . the client has given knowing and informed consent after consultation.").

In the UK Arbitration, Holmes and Fisher, on Munich Re's behalf, took the

position that Munich Re did not owe compensation to NGC for certain losses related

to Hurricane Katrina because the Navy had previously paid Defendants to

compensate for those losses. *See* United States' Consolidated Resp. to Relators' *Ex

Parte* Motions 6-7 [14]. However, at the same time he was representing Munich Re

in the UK Arbitration Holmes filed the Complaint [1] and First Amended

Complaint [43], in which he alleged that the Navy should have never paid funds to

Defendants and that it was Defendants' fraudulent conduct which duped the Navy

into paying the funds. *Id*. Holmes has not sufficiently disputed this

characterization of the conflicting positions he took as counsel for Munich Re, on the

one hand, and as a relator in this case seeking over 2.5 billion dollars,[6] on the other.

---

[6] Holmes alleges that the United States was defrauded in the amount of "not less than $835 million"
and "prays . . . for treble that sum or $2.505 billion" dollars.  First Am. Compl. 23 [43].

These positions reflect a conflict between Holmes' personal interest as a relator, arguing that the Navy's payments to Northrop Grumman were invalid, and Holmes' interest as counsel to Munich Re, advocating the validity of those same payments to alleviate Munich Re's responsibilities to Northrop Grumman.  Consequently, the record supports a finding that there was at least "a significant risk" that Holmes' representation of Munich Re was "materially limited by" Holmes' "personal interest" in pursing this *qui tam* case, such that Holmes' conduct created a concurrent conflict of interest jeopardizing his obligation of loyalty to Munich Re. *See* ABA Model Rule 1.7(a).

Faced with this conflict, there is no evidence that Holmes obtained any kind of "informed consent" from Munich Re to simultaneously represent Munich Re while prosecuting this *qui tam* action.  *See* ABA Model Rule 1.7 (prohibiting concurrent conflicts of interest but making an exception where the attorney obtains affected clients' informed consent).  "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  ABA Model Rules 1.0(e); *see also* DCRPC 1.0(e) (same); MRPC, Terminology ("'Informed consent' denotes voluntary acceptance and agreement by a person of a proposed course of conduct after adequate information has been imparted to the person that allows the person to arrive at a decision.").  The Comment to ABA Model Rule 1.0(e) notes that informed

consent is often required "before . . . pursuing a course of conduct."  Comment [6],

ABA Model Rule 1.0 (citing ABA Model Rules 1.2(c), 1.6(a) and 1.7(b)).  The

Comment also states

> [t]he lawyer must make reasonable efforts to ensure that the client or
> other person possesses information reasonably adequate to make an
> informed decision. Ordinarily, this will require communication that
> includes a disclosure of the facts and circumstances giving rise to the
> situation, any explanation reasonably necessary to inform the client or
> other person of the material advantages and disadvantages of the
> proposed course of conduct and a discussion of the client's or other
> person's options and alternatives.

Comment [6], ABA Model Rule 1.0.

The record does not reveal facts supporting a finding that Holmes obtained

Munich Re's informed consent at any point in time to engage in a course of conduct

which created a concurrent conflict of interest between Holmes' duties to Munich Re

and his own personal interests in this case.  Holmes suggests that he obtained

consent from Munich Re, but the timing of Munich Re's "consent" is questionable

and there is no evidence the consent was "informed."  Specifically, Holmes contends

> [the DOJ] directly asked the client, Munich Re, orally and in writing,
> specifically whether it had any concerns about its counsel disclosing the
> information of the fraud to the DOJ.  Munich Re specifically responded
> in writing that it had no objection and did not participate in that decision,
> but respected counsel's view of their obligations to disclose to [the] DOJ
> under U.S. law.

Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 9 [156].  Holmes does not

identify when he discussed his perceived legal obligations with Munich Re, the

content of those discussions, or whether Munich Re had the benefit of independent

counsel.  *See id.*; *see also* Relators' Mot. to Assist the DOJ 10 [11, 12 of 86]; Holmes

Aff. 6-7 [11, 41-42 of 86]  (asserting that Munich Re consented to Holmes' actions

without any indication of what, if any, information was provided to Munich Re,

when that information was provided, or on what basis Munich Re made its alleged

decision to consent).  Holmes thus has not demonstrated facts supporting a finding

that Holmes had Munich Re's informed consent to engage in conduct that involved a

concurrent conflict of interest, and as such, Holmes breached his duty of loyalty to

his client, Munich Re, in order to bolster his position in this case.

      c.    <u>Duty to Retain Confidentiality of Information</u>

The ABA Model Rules, the MRPC, and the DCRPC each require attorneys to

keep information relating to the representation of a client confidential.  "A lawyer

shall not reveal information relating to the representation of a client unless the

client gives informed consent[] . . . ."  ABA Model Rule 1.6(a); *see also* MRPC 1.6(a)

(same); DCRPC 1.6(a) ("[A] lawyer shall not knowingly: . . . reveal a confidence or

secret of the lawyer's client[,] . . . use a confidence or secret of the lawyer's client to

the disadvantage of the client[, or] . . . use a confidence or secret of the lawyer's

client for the advantage of the lawyer or of a third person. . . .).[7]

Holmes has revealed and attempted to make personal use of information

relating directly to his representation of Munich Re in the form of documents he

---

[7] Rule 1.6(b) of the DCRPC defines "confidence" and "secret" as follows: "'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client."

obtained on Munich Re's behalf from the Navy and Northrop Grumman for use in the UK Arbitration.  Relators' Mot. to Assist the DOJ [11, 4 of 86] ("Relators have provided the Government with an extensive Disclosure Memorandum pointing out that the evidence of this fraud is based on documents available directly from the Navy, many of which Relators obtained pursuant to *Touhy* Regulation Requests in connection with ongoing litigation on an insurance claim.").  These documents were subject to various confidentiality obligations existing between Munich Re, Northrop Grumman, and the Navy, and a Stipulated Protective Order imposed by the United States District Court for the District of Columbia.  *See* Ex. "1" to Relators' Mot. to Assist the DOJ [11, 56-66 of 86]; Stipulated Protective Order [20-1], Case No. 1:10-cv-551-JEB (D.D.C.).  There is no indication that Holmes would have otherwise come into possession of these documents but for his representation of Munich Re. Holmes acknowledged using these documents to pursue this *qui tam* action in which he seeks over 2.5 billion dollars, a portion of which would be available to him by virtue of his serving as relator.  *See, e.g.*, First Am. Compl. 9, 10, 23 [43].  Absent Munich Re's informed consent, Holmes violated the duty to keep information related to his representation of Munich Re confidential when he revealed and made use of the documents he obtained during his representation of Munich Re.[8]

---

[8] In addition, it is likely that Holmes' conduct violated Rule 4.4(a) of the ABA Model Rules.  "In representing a client, a lawyer shall not use . . . methods of obtaining evidence that violate the legal rights of . . . a [third] person."  ABA Model Rule 4.4(a); *see also* DCRPC 4.4(a) (same); MRPC 4.4(a) (same).  In obtaining documents from Northrop Grumman and the Navy, Holmes, on behalf of Munich Re, submitted to at least one agreement to keep documents Munich Re received from Northrop Grumman confidential and participated in the creation and submission of the Stipulated Protective Order restricting the use and dissemination of documents received by Munich Re from the Navy.

Holmes has not shown that he obtained Munich Re's informed consent prior to revealing and making use of confidential information he obtained as counsel for Munich Re.  *See* ABA Model Rule 1.6 (prohibiting attorneys from revealing clients' confidential information absent the client's informed consent).  Holmes appears to acknowledge that Munich Re "did not participate in" his decision to disclose to the DOJ documents that he obtained on Munich Re's behalf and which fell within the scope of the various confidentiality obligations he owed Munich Re.  Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 9 [156]; *see also* ABA Model Rule 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent[] . . . ."); MRPC 1.6(a) (same); DCRPC 1.6(a) ("[A] lawyer shall not knowingly: . . . reveal a confidence or secret of the lawyer's client[,] . . . use a confidence or secret of the lawyer's client to the disadvantage of the client[, or] . . . use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person. . . .").  Similar to his actions surrounding the concurrent conflict of interest which jeopardized his duty of loyalty to Munich Re, Holmes has not sufficiently established that he obtained Munich Re's informed consent prior to revealing Munich Re's confidential information.  Consequently, Holmes breached his duty to protect his client's confidential information.

---

Holmes' use of these documents for his own purposes in this *qui tam* action can reasonably be construed as violating the legal rights of Northrop Grumman and the Navy.

18

d.      Holmes' Duty to Obey Court Orders

Perhaps the most serious of the ethical violations committed by Holmes is his having knowingly ignored his obligations under the Stipulated Protective Order entered in the *Touhy* Action by the United States District Court for the District of Columbia.  "A lawyer shall not[] . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists . . . ."  ABA Model Rule 3.4(c); *see also* DCRPC 3.4(c) (same); MRPC 3.4(c) (same).  Holmes notes that the Stipulated Protective Order was first submitted as a proposed order and seems to argue that it should not be treated as a court order.  Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 10-11 [156]. This argument overlooks the fact that Holmes jointly submitted the Stipulated Protective Order as a proposed order, and the United States District Court for the District of Columbia specifically entered the Stipulated Protective Order "as an [O]rder of the Court . . . ."  Order 1 [20-1], Case No. 1:10cv551-JEB (D.D.C). Holmes was undoubtedly required to comply with the obligations imposed by the Stipulated Protective Order.

The Stipulated Protective Order provides that documents produced by the Navy "shall be used or disclosed solely in the UK Arbitration" and "shall not be used in any other proceeding or for any other purpose without further order of this Court."  *Id*. at 6-7 [20-1, 9-10 of 13].  Holmes openly acknowledges that he violated the terms of the Stipulated Protective Order by his admission that he disclosed

documents subject to the Stipulated Protective Order to the DOJ and allowed his

"expert team" to analyze such documents.[9]  Relators' Mot. to Assist the DOJ 2, 10-

12 [11, 4, 12-14 of 86].  If he had an objection to the Navy's designation of any

information as being protected under the Stipulated Protective Order, the

Stipulated Protective Order required Holmes to make an objection to the particular

designations, but the record does not reveal that Holmes made any such objections.

Stipulated Protective Order 8 [20-1, 11 of 13], Case No. 1:10cv551-JEB (D.D.C.); *see

also* Resp. in Opp'n to Defs.' Mot. to Disqualify and Dismiss 6 [156] ("With perfect

20/20 hindsight[,]" Holmes agrees that he "should have separately sought [the

Court's] permission to use the documents" obtained in the *Touhy* Action and that

doing so "would have been a good thing to do . . . .").  Holmes was well aware of the

terms of the Stipulated Protective Order, and requested that the District Court for

the District of Columbia enter the Stipulated Protective Order, but knowingly

violated the obligations imposed by that Order in pursuit of his own interests in

this *qui tam* action.  Holmes' violation of the Stipulated Protective Order is yet

---

[9] Prior cases indicate that one court generally should decline from evaluating whether a litigant before it has violated the order of another court.  *See, e.g.*, *In re Wright*, No. Civ. A. 06-356, 2006 WL 508050, at *3 (E.D. La. Feb. 22, 2006) ("[I]t would be an unwise policy for one court to determine whether a litigant violated another court's order.") (citing *In re Marriage of Smith*, 549 F. Supp. 761, 755 (W.D. Tex. 1982)).  The Court, however, finds that this general principle is not implicated under the specific facts of this case because Holmes has acknowledged repeatedly that he violated the Stipulated Protective Order and thus the Court need not determine whether a violation has occurred.  Moreover, the Court expressly limits its consideration of Holmes' violation of the Stipulated Protective Order to being only one of several factors militating in favor of disqualifying Holmes from serving as a relator in this case.  Still, the seriousness of Holmes' violation of the Stipulated Protective Order should not be overlooked.  *See Holden v. Simpson Paper Co.*, 48 F. App'x 917, 2002 WL 31115137, at *2 (5th Cir. Sept. 18, 2002) ("Deliberately disobeying court orders demonstrates sufficient bad faith to justify a district court's sanction under its inherent powers.").

another example of his unethical conduct surrounding his actions as a relator in this case.

    3.    <u>The Totality of Holmes' Ethical Violations Require His Disqualification as Relator</u>

When viewed in its entirety, Holmes' conduct reveals multiple improprieties. *See U.S. Fire*, 50 F.3d at 1314 (noting that courts adjudicating a motion to disqualify should consider, in addition to relevant ethical precepts, the impropriety of counsel's conduct and the extent to which public suspicion of that conduct outweighs any social interests served by allowing counsel to continue participating) (quoting *Dresser*, 972 F.2d at 544) (internal marks omitted).  Holmes' conduct did not merely bear the appearance of impropriety but was in fact improper.  Holmes violated his duty of loyalty to Munich Re by simultaneously advocating a position for Munich Re that was completely contrary to the position he continues to advocate as relator in this case.  Holmes violated his duty to retain confidential information by allowing his own interest in pursing this *qui tam* action to override his duties to Munich Re related to the confidentiality of documents he obtained on Munich Re's behalf, which placed Munich Re in jeopardy of violating various confidentiality obligations to which Holmes knew his client was bound.  In seeking to build support for his *qui tam* case, Holmes also knowingly violated the Stipulated Protective Order issued by the court in the *Touhy* Action.  All the while, Holmes violated his duty of candor by failing to apprise the court in the *Touhy* Action or counsel for

NGC in the UK Arbitration of his motives for obtaining the confidential information.

The accompanying public suspicion arising from Holmes' conduct outweighs any social interest in permitting him to continue participating as a relator. *See U.S. Fire*, 50 F.3d at 1314 (5th Cir. 1995) (quoting *Dresser*, 972 F.2d at 544). The potential for public suspicion stemming from this conduct is exemplified by the DOJ's concerns that Holmes' conduct gave rise to "serious ethical and professional responsibility concerns . . . ." United States' Consolidated Resp. to Relators' *Ex Parte* Motions 6 [14]. Furthermore, in considering Holmes' disqualification, the Court is not faced with the prospect of disqualifying an innocent party's chosen counsel. Rather, disqualifying Holmes only precludes him from receiving the benefits which may otherwise be available to him personally as a relator, such that the social interests in allowing him to continue participating in this case are minimal. The Court finds that based on the totality of the ethical violations committed by Holmes surrounding this *qui tam* case, Holmes should be disqualified from serving as relator in this case.

4.   Dismissal of the First Amended Complaint

In determining whether dismissal of the First Amended Complaint [43] is warranted, the pertinent inquiry is the extent to which Northrop Grumman stands to suffer prejudice if the action were to proceed to trial. *See Quest Diagnostics*, 734 F.3d at 166-67 (affirming district court's decision to disqualify relators and dismiss

their *qui tam* complaint due to the fact that allowing the case to proceed "would taint the trial proceedings and prejudice defendants").  Here, the Court finds that merely disqualifying Holmes from serving as relator without dismissing the case would greatly prejudice Northrop Grumman because the case would be tried on a record developed primarily through the fruits of Holmes' unethical conduct.  In addition, the fact that the United States government rather than Holmes is the real party in interest further supports dismissing Holmes' First Amended Complaint [43].  *See United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005).  Namely, as the real party in interest, the government would not be prevented from bringing these or similar claims against Northrop Grumman. *See Quest Diagnostics*, 734 F.3d at 167 (noting that dismissal of the disqualified relators' complaint was further justified by the fact that neither the United States, as the real party in interest, nor any other relator was foreclosed from bringing the claims).  The Court thus finds that the First Amended Complaint [43] should be dismissed with prejudice as to Holmes but without prejudice as to any rights of the United States.[10]

---

[10] The Fifth Circuit has found that dismissal of a relator's complaint should not necessarily operate as a dismissal with prejudice against the United States merely because it opted not to intervene. *Williams*, 417 F.3d at 454-55 (finding that dismissal of a relator's complaint for failure to comply with Rule 9(b) did not operate as a dismissal with prejudice against the government simply because the government did not intervene).  This is because the FCA "does not require the government to proceed if its investigation [of allegations in a *qui tam* complaint] yields a meritorious claim."  *Id.* at 455.

## III. CONCLUSION

Based on the foregoing, the Court concludes that Donald Holmes should be disqualified from serving as a relator in this *qui tam* case, and that this civil action should be dismissed with prejudice as to Holmes, but without prejudice to any rights possessed by the United States government.

**IT IS**, **THEREFORE**, **ORDERED AND ADJUDGED** that the Motion to Disqualify Relator and Dismiss the First Amended Complaint [151] filed by Defendants Northrop Grumman Corporation and Huntington Ingalls Incorporated is **GRANTED**.

**IT IS**, **FURTHER**, **ORDERED AND ADJUDGED** that Donald Holmes is **DISQUALIFIED** from serving as a relator in this *qui tam* case.

**IT IS**, **FURTHER**, **ORDERED AND ADJUDGED** that this case is **DISMISSED WITH PREJUDICE** as to Donald Holmes, but **WITHOUT PREJUDICE** as to any rights of the United States government.

**IT IS**, **FURTHER**, **ORDERED AND ADJUDGED** that the Motion to Dismiss Amended Complaint [102] filed by Defendants Northrop Grumman Corporation and Huntington Ingalls Incorporated is **DENIED AS MOOT**.

**SO ORDERED AND ADJUDGED**, this the 3rd day of June, 2015.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE